Steve Vartazarian, Esq. (SBN 227635)
Matthew J. Whibley, Esq. (SBN 299383)
Sarkis Yenikomshuyan, Esq. (SBN 343529)
**THE VARTAZARIAN LAW FIRM**
23621 Park Sorrento, Suite 101
Calabasas, California 91302
Phone: (818) 990-9949
Fax: (818) 990-6124
mail@thevlf.com

Attorneys for Plaintiff,
JENNIFER REGAN

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER REGAN<br><br>　　　　Plaintiff,<br><br>v.<br><br>CITY OF FRESNO, FRESNO POLICE DEPARTMENT, OFFICER ART DELEON, OFFICER LINDSAY DOZIER, OFFICER TERRY COOPER, OFFICER MATTHEW BRANDT, OFFICER DANIEL CORONA, OFFICER TY MCFADDEN and DOES 1 through 50<br><br>　　　　Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>　1.　**42 U.S.C. §1983 – State Created Danger Doctrine**<br>　2.　**42 U.S.C. §1983 – Failure to Train or Supervise**<br><br>**[DEMAND FOR JURY TRIAL]** |

## COMPLAINT FOR DAMAGES

COMES NOW PLAINTIFF, JENNIFER REGAN, in this complaint against CITY OF FRESNO, FRESNO POLICE DEPARTMENT, OFFICER ART DELEON, OFFICER LINDSAY DOZIER, OFFICER TERRY COOPER, OFFICER MATTHEW BRANDT, OFFICER DANIEL CORONA, OFFICER TY MCFADDEN and DOES 1 through 50, inclusive (collectively "Defendants") allege as follows:

# I. JURISDICTION AND VENUE

1. This civil rights action seeks compensatory from individual police officers, officers, officials, and the City of Fresno Police Department for violation of fundamental rights under the United States Constitution and state law in connection with the brutal and tragic shooting of Plaintiff on July 9, 2021.

2. Jurisdiction of this Court arises under 28 U.S.C. §§ 1331 and 1343, as this action is brought under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution.

# II. PARTIES

3. Plaintiff, JENNIFER REGAN, is a resident of the City of Fresno, County of Fresno, State of California.

4. Defendant, CITY OF FRESNO, is a municipality in the State of California.

5. Defendant, FRESNO POLICE DEPARTMENT, is a law enforcement agency operating under the authority of the City of Fresno.

6. Defendant, OFFICER ART DELEON, is a police officer employed by the Fresno Police Department, sued in his individual capacity.

7. Defendant, OFFICER LINDSAY DOZIER, is a police officer employed by the Fresno Police Department, sued in her individual capacity.

8. Defendant, OFFICER TERRY COOPER, is a police officer employed by the Fresno Police Department, sued in her individual capacity.

9. Defendant, OFFICER MATTHEW BRANDT, is a police officer employed by the Fresno Police Department, sued in his individual capacity.

10. Defendant, OFFICER DANIEL CORONA, is a police officer employed by the Fresno Police Department, sued in his individual capacity.

11. Defendant, OFFICER TY MCFADDEN, is a police officer employed by the Fresno Police Department, sued in his individual capacity.

12. At all relevant times to the present complaint, Defendant officers were acting within their capacity as employees, agents, representatives, supervisors, policy makers and servants of

Defendant City of Fresno Police Department, which is liable under the doctrine of respondeat superior, pursuant to Sections 815.2, 820 and 825 of the Government Code, et al.

13. DOES 1-15, inclusive, were police officers acting within their capacity as employees, agents, representatives, supervisors, policy makers and servants of Defendant City of Fresno Police Department, which is liable under the doctrine of respondent superior, pursuant to Sections 815.2, 820 and 825 of the Government Code, et al.

14. Defendant DOES 16 through 30 are persons or entities responsible for creation of the de facto policies discussed herein, and liable under the doctrine of respondeat superior, pursuant to Sections 815.2, 820 and 825 of the Government Code, et al.

15. Defendant DOES 31 through 50 are individuals and entities otherwise responsible for and contributed to Plaintiff's harm discussed herein.

### III.   GENERAL FACTUAL ALLEGATIONS

16. The Plaintiff re-alleges and incorporates by reference all allegations contained in the preceding paragraphs.

17. On July 9, 2021, while the Plaintiff was stopped at a red light on her way to work, Mario Colombo approached her and shot her twice in the upper body. Jack Noriega drove Mario Colombo to and from the location where the ambush occurred. After being shot, the Plaintiff collided with another vehicle at the intersection of Herndon Ave. and N. First Street. Fresno Police Department officers discovered the Plaintiff with multiple gunshot wounds when they responded to a call for a traffic accident at the intersection.

18. Plaintiff was shot through the neck, which severed her spinal cord. She miraculously survived the shooting, but she is quadriplegic, entirely dependent on others for all activities of daily living including feeding, bathing, dressing, and using the bathroom.

19. Prior to this incident, Plaintiff was a long-time, reliable employee of Kaiser Permanente Hospital in Fresno.

20. Plaintiff and Mario Colombo knew each other for several years and dated for approximately two months in 2019, before the Plaintiff ended the relationship. She broke

up with Colombo immediately after learning he was unstable and apparently had a girlfriend.

21. In March 2020, oPlaintiff first reported to the Fresno Police Department that she was receiving harassing voicemail messages from Mario Colombo due to the break up.

22. Phone records, surveillance footage from Plaintiff's home, Defendant's documentation, call logs, recordings, body cam footage, and other forms of evidence reveal a persistent pattern of threats, stalking, and harassment by Mario Colombo against Plaintiff, despite the existence of a valid Criminal Protective Order (CPO) against him.

23. On multiple occasions before and after the issuance of the CPO, Plaintiff reported Colombo's threatening and stalking behavior to the Fresno Police Department, to no avail.

24. Plaintiff provided substantial evidence of Colombo's threats in the form of videos, voicemails, text messages, and photos, all of which were consistently ignored by the police.

25. Furthermore, police officers routinely engaged in victim-blaming, questioning Plaintiff's decisions, and implying culpability on her part in Colombo's stalking and obsession, adding to her distress and fear.

26. On March 21, 2020, Officer M. Elms, who is not a Defendant, responded to a telephone report concerning ongoing annoying and harassing text messages. The female victim, Plaintiff, reported that following a breakup with the male offender, Colombo, he persistently harassed her, even showing up at her residence on one occasion. Plaintiff sent Officer Elms the harassing text messages via email, which were duly attached to Axon Records.

27. On April 29, 2020, Plaintiff was forced to call the Fresno Police Department after her ex-boyfriend, Mario Colombo, appeared uninvited at her residence, visibly irate about their breakup. Colombo provocatively confronted Plaintiff's brother-in-law in the front yard, leading to a scuffle that left the brother-in-law with visible scratches on the right side of his face, neck, and forearm. Despite the altercation, he declined to pursue a criminal complaint or have his injuries photographed.

28. Investigating Officer Lopez, who is not a Defendant, was informed that Plaintiff, out of

concern for their safety, had intervened and warned Colombo to leave, stating that she had called the police. Colombo subsequently fled the scene, with Plaintiff informing Officer Lopez that Colombo might be residing at a nearby trailer park. She was advised on how to seek a restraining order against Colombo, marking this as the second harassment-type event involving Colombo that Plaintiff had reported.

29. Over the course of 2020, Plaintiff made several other complaints about Colombo to various officers, who are not Defendants.

## IV. SPECIFIC FACTUAL ALLEGATIONS GIVING RISE TO LIABILITY

30. Plaintiff re-alleges and incorporates by reference all allegations contained in the preceding paragraphs.

31. On January 4, 2021, Officer Paige McQuay, who is not a Defendant, contacted Plaintiff. She advised that Colombo had made multiple, unconditional, viable threats to shoot and murder her. The threats were left by Colombo via voicemail and recorded by Officer McQuay's department-issued Axon body camera. There were at least five messages, amounting to five counts of violations of PC 422. Colombo was arrested, and under Miranda, he admitted to threatening Plaintiff.

32. On January 4, 2021, the Fresno Police Department arrested Mario Colombo for making criminal threats against the Plaintiff, threatening to get his guns from storage and kill her. An officer obtained an emergency protective order (EPO) protecting the Plaintiff, and her minor child. The Fresno District Attorney's Office filed a felony complaint against Mario Colombo for making criminal threats.

33. On January 4, 2021, Mario Colombo was arrested for the threats he made on Plaintiff's life.

34. On January 7, 2021, Mario Colombo was served with a Court-issued CPO at his arraignment for the criminal threats.

35. The CPO ordered that Colombo must cease all contact with Plaintiff, including electronic, phone calls, and text messages. It further ordered Colombo to stay away from Plaintiff's person, home, work, and family.

36. Plaintiff subsequently reported five separate and distinct incidents to the Fresno Police

Department, proving unequivocally that Mario Colombo violated the CPO and was actively threatening to shoot her, which are the subject of this lawsuit.

37. On February 2, 2021, Plaintiff called Defendants to report that Colombo violated a CPO.

38. On February 4, 2021, at about midnight, Officer Daniel Corona investigated Colombo's violation of the CPO by showing up at her home. Officer Corona arrived late at night startling Plaintiff because she thought it was Colombo coming to her house.  He confirmed that the CPO had been violated by Colombo several times via text messages and voicemails, which included claims by Colombo that Plaintiff had destroyed his life and caused him dangerous medical conditions.

39. On February 4, 2021, Officer Corona confirmed and documented that Colombo was in violation of a valid CPO. When Corona attempted to reach Colombo, the suspect claimed he was not home and abruptly ended the call, refusing to answer subsequent calls.

40. On February 4, 2021, rather than taking any action against Colombo, Officer Corona callously suggested to Plaintiff that she should simply change her phone number. Inappropriately placing the onus on the victim, Officer Corona implied in a dismissive tone that such a change would be a comprehensive solution to end Colombo's harassment and threats, thereby contributing to a pattern of victim-blaming instead of adequately addressing the violation.

41. On April 21, 2021, Plaintiff called the police to report another violation by Colombo. Instead of coming to the house, Defendants opted to do a phone investigation only.

42. On April 22, 2021, Officer Dozier called Plaintiff. She reported to Officer Dozier that she saw her ex-boyfriend, Colombo, parked near her house while she was leaving for work. Officer Dozier confirmed that Plaintiff had a valid CPO in place and that prior threats on Plaintiff's life had been made by Colombo.

43. Officer Dozier confirmed that Colombo's proximity to her home was a clear violation of the CPO.

44. On April 22, 2021, Officer Dozier provided confusing, incorrect, and inconsistent instructions on what actions Plaintiff could take, further exacerbating her fear and sense of

vulnerability. She stated on the one hand Regan had to go to the police station to fill out paperwork but simultaneously said it was closed due to COVID.

45. Officer Dozier mailed Plaintiff a Marsy's Form Letter (also known as Victim's Rights Form, described in more detail below) and a Domestic Violence Form Letter. Officer Dozier took no further action.

46. On May 30, 2021, Officer Art Deleon responded to a call from Plaintiff's residence, whereupon arrival, Plaintiff presented him with two live .223 round bullets and a threatening letter she had found on her doorstep, items she knew were left by Colombo because it was captured on her security camera. Despite the gravity of this evidence, Officer Deleon did not seize these items as evidence.

47. During this encounter, Plaintiff informed Officer Deleon about her distressing circumstances: she was losing her hair out of stress and fear, she believed Colombo was on drugs, and she had previously found him lying on her driveway acting peculiarly. She reported her constant fear of being watched, noting that Colombo drove a white Hyundai Accent. She also informed Officer Deleon that her Ring camera had captured evidence of Colombo's presence.

48. Officer Deleon confirmed the existence of a valid CPO against Colombo. Despite the severity of the situation and the clear violation of the CPO, he told Plaintiff there was nothing he could do at that moment, except take a report. He further advised that Plaintiff would need to go to the police department to file a complaint, need to call the Domestic Violence Unit, wait and hope for a district attorney to do something, and other confusing advice.

49. Even when offered Colombo's last known address by Plaintiff, Officer Deleon chose to report it as unknown. During the interaction, he also insinuated that many women do not follow through with claims of domestic violence, so law enforcement do not always take it seriously, implying that the onus of the situation was on Plaintiff.

50. Officer Deleon misinformed Plaintiff that her only recourse was to "sign a criminal complaint" and that no one could do anything about the situation until after 7 days from the

report, but not more than 30 days of the report. He further falsely stated that Colombo's violation of the CPO could only be acted upon within 30 days, indirectly blaming Plaintiff for Defendants' inaction.

51. Despite the confusing and inconsistent advice, Officer Deleon gave Plaintiff a false sense of security by assuring her that this event would lead to a charge against Colombo for violation of a restraining order, implying that an arrest of Colombo would in fact be made.

52. However, Officer Deleon did nothing in response to this investigation except type up a report and go home for the day. He did not confront Colombo, arrest him, call him, warn him nor communicate with him in any way despite knowing his address, phone number, make and model of his vehicle and whereabouts.

53. On June 23, 2021, Officer Matthew Brandt and Officer Ty McFadden responded to a call that Colombo was again threatening Plaintiff and leaving her voicemails. Officer Brandt obtained one of those voicemails and saved it AXON. The voicemail stated in part, "the cops took my guns... If you don't come meet me today, Jen, I promise you, you're not gonna like the outcome."

54. Colombo was a well-known, strong proponent of his Second Amendment rights. His public Facebook account made it clear that he viewed any intrusion on his Second Amendment as a violent and personal attack against him for which he would take revenge for. Colombo believed Plaintiff was to blame if his guns were taken away.

55. On June 23, 2021, Officer Brandt and McFadden confirmed through records check that Colombo had registered firearms, and that there was a valid CPO which Colombo was in violation of. It was unclear whether law enforcement had in fact taken Colombo's guns away, but it appears not.

56. On June 23, 2021, nor any time after, Officer Brandt and McFadden failed to take any action besides for mailing a Victim of Domestic Violence and Marsy's Law Form. They did not confront Colombo, arrest him, call him, warn him nor communicate with him in any way despite knowing his address, phone number, make and model of his vehicle and whereabouts.

57. Plaintiff called the Defendant's Domestic Violence Unit on June 30, 2021, and left a message; however, the phone line voicemail messages were not reviewed until after the shooting incident on July 9, 2021.

58. On July 3, 2021, Plaintiff reported to the Fresno Police Department that Mario Colombo left her numerous voicemails and text messages. The call-taker mistakenly classified the call for service as requiring only a telephonic response.

59. No officers followed up with Plaintiff or investigated the incident until July 7, 2021.

60. On July 7, 2021, while seated in her patrol car, Officer Terry Cooper called Plaintiff instead of going to investigate in person. She confirmed the existence of a valid CPO and read on her computer that Colombo had violated it several times. Plaintiff supplied Officer Cooper with voicemails in which Colombo threatened her.

61. On July 7, 2021, Plaintiff told Officer Cooper that Colombo was reportedly on drugs, including Meth, a drug universally known amongst law enforcement to cause paranoia and impulsiveness.

62. On July 7, 2021, Plaintiff told Officer Cooper that she received a call from Colombo's ex-girlfriend that Colombo had been burning bridges with all his friends, that he had stolen a gun, and that he had stolen the gun with the specific intent to use it to kill Plaintiff.

63. On July 7, 2021, Plaintiff provided Officer Copper a text message from Colombo's ex-girlfriend sent to Plaintiff that stated: Colombo wanted to kill Plaintiff and stole a friend's firearm.

64. During an unrecorded portion of the call, Officer Cooper said she was going to send detectives to arrest Colombo right away, thereby giving Plaintiff a confusing and inconsistent sense of security.

65. On July 7, 2021, Officer Cooper did not in fact do anything to warn, arrest, deter, or do anything of any nature to stop or thwart Colombo.

66. On July 9, 2021, Mario Colombo ambushed Plaintiff at a red light, shooting her twice in the upper body. Plaintiff subsequently crashed into another vehicle at Herndon Ave. and N. First Street due to her injuries. Jack Noriega facilitated this attack by driving Colombo to

and from the scene. Fresno Police found Plaintiff, bearing multiple gunshot wounds, when they responded to the subsequent traffic accident.

67. After the investigations by Officer Corona, Dozier, Deleon, Brandt, McFadden, and Cooper, each officer would send a "Victims Right" form, which gave information to Plaintiff which lulled her into a false sense of security. The form, which was from Defendants, in writing, expressly promised and told Plaintiff, among other things, that: they would undertake all efforts to treat her with fairness and respect; she would be free from intimidation, harassment, and abuse from Colombo throughout the criminal justice process; she would receive protection from Colombo and persons acting on behalf of Colombo; her and her family's safety would be considered when releasing Colombo from custody; and she would be told about his release from custody.

68. There are and were several laws, policies, and constitutional rights that required Defendants to act on Colombo's repeated violations of the CPO and threats made on Plaintiff.

69. The following statutory provisions and internal policies were breached by Defendant police officers in their handling of Colombo's repeated violations of the CPO:

   a. California Penal Code §836(c) compels police officers, including the Defendants in this case, to arrest an individual upon any breach of a CPO. This law was amended by the California legislature in 1999 to compel officers to arrest a violator of a CPO, as opposed to merely authorizing or encouraging it, for the specific reason that officers were not taking CPO violations seriously enough.

   b. California Penal Code §853.6(a)(2) stipulates that an individual found to be violating a CPO must be presented promptly before a magistrate by a police officer, precluding the option of citation and release.

   c. California Penal Code §18250(a) mandates that police officers must seize firearms from anyone found to be contravening a CPO.

   d. The Fresno Police Department Policy Manual on Domestic Violence enumerates specific directives that the Defendant officers failed to observe:

      i. Treat incidents of domestic violence and/or protective order violations as high-priority calls.

      ii. Enforce criminal laws pertaining to domestic violence, protect the victim, and leverage civil remedies and community resources.

      iii. Arrest domestic violence offenders if there is probable cause to believe an offense has taken place.

      iv. Disregard factors that should not dissuade an officer from making an arrest in response to domestic violence, including but not limited to: Marital status of the suspect and victim; The suspect's cohabitation with the victim; The presence or absence of a temporary restraining order; Potential financial consequences of an arrest; History of the complainant's previous complaints; Assurances from the suspect that violence will cease; Non-visible injuries; The victim's reluctance to prosecute or make a private person's arrest; Speculation about the complainant's commitment to prosecution; Potential failure to achieve a conviction; Any actual or perceived characteristics or status of the victim or suspect; The social, community, or professional status of the victim or suspect.

e. Arrest, rather than field release, a CPO violator threatening the victim.

f. Inform victims of their right to execute a citizen's arrest and facilitate its execution.

g. Independently report violations to the domestic violence unit, without solely relying on the victim.

h. Request photographs of the violator and the perpetrator of domestic violence.

i. Confiscate firearms from the CPO violator and domestic violence perpetrator.

j. Execute mandatory arrests of CPO violators, irrespective of whether the violation occurred in the officer's presence.

k. Assist victims by clarifying their legal options.

l. Strive to accumulate and preserve evidence.

70. The factual circumstances reveal clear statutory and policy breaches on the part of the

defendant police officers.

71. The obligation under California Penal Code §836(c) for police officers to arrest an individual for any violation of a CPO was not fulfilled, despite Colombo's numerous violations of the CPO, as reported by Plaintiff.

72. The requirement under California Penal Code §853.6(a)(2) that violators of a CPO must be promptly presented before a magistrate was not adhered to by the officers involved, as evidenced by the events involving Plaintiff and Colombo.

73. Contrary to California Penal Code §18250(a), which demands the confiscation of firearms from CPO violators, Colombo retained access to a firearm and was able to shoot Plaintiff.

74. Furthermore, the Fresno Police Department Policy Manual on Domestic Violence provides several directives that were breached.

75. The high-priority treatment of domestic violence and/or protective order violations was not observed. Despite Plaintiff's numerous reports, officers' responses often lacked urgency and follow-through.

76. Officers disregarded the policy to enforce laws related to domestic violence and protect the victim. This is evidenced by the victim-blaming attitude displayed and the failure to take sufficient measures to protect Plaintiff.

77. Probable cause to believe an offense occurred should lead to an arrest. However, despite clear evidence of Colombo's threats and CPO violations, officers did not arrest him.

78. Officers permitted factors, such as the potential that Plaintiff might not follow through with the prosecution, to prevent an arrest. This is in violation of the policy that explicitly states such factors should not deter an arrest.

79. Field release was not an option in this scenario, as Colombo was threatening Plaintiff, yet no arrest was made.

80. The police officers did not inform Plaintiff about the possibility of a citizen's arrest, nor did they facilitate its execution.

81. Plaintiff reported the violations of the CPO, but it is unclear whether officers independently reported these incidents to the domestic violence unit.

82. Officers did not request a photograph of Colombo, the domestic violence perpetrator, as required by the policy.
83. Colombo's firearm was not confiscated as required by the policy, which may have enabled the shooting incident.
84. There were multiple instances where CPO violations occurred, but the officers did not make the required arrests.
85. Plaintiff received confusing and inconsistent advice about her legal options from officers, contrary to the policy requirement of officers assisting victims in understanding their legal options.
86. Plaintiff provided evidence, including live bullets, a threatening letter, and voicemails, but officers did not make every effort to gather and retain these pieces of evidence.
87. This lawsuit contends that the officers' combined failure to enforce the domestic violence laws, confront Colombo, and fulfill their professional obligations resulted in the most devastating consequences for Plaintiff. Their willful neglect transformed what should have been a shield of protection into a deadly trap for Plaintiff, and this lawsuit seeks justice for this egregious violation of her rights.
88. Mario Colombo's unbroken chain of threats and violations against Plaintiff, met with indifference and inaction by law enforcement, unequivocally bred a sense of invulnerability and impunity within him. This stark lack of repercussions was misconstrued by Colombo as tacit endorsement of his delusional obsession with Plaintiff, validating his belief in his right to intimidate, threaten, and ultimately harm her.
89. In the face of repeated CPO violations, the law enforcement's glaring absence of necessary interventions—such as arrest or prosecution—resulted in a perceived immunity for Colombo. This absolute lack of accountability unquestionably emboldened Colombo, instilling in him a conviction that he could persist in his threatening behavior without fear of being held accountable. This unbridled sense of invulnerability and empowerment escalated his aggression and audacity, culminating in his violent tendencies towards Plaintiff.

**COMPLAINT FOR DAMAGES**

90. The glaring absence of law enforcement intervention distorted Colombo's perception of societal and legal norms and personal boundaries. Colombo interpreted the police inaction as a sign that his dangerous obsession with Plaintiff was justified, even sanctioned, further nourishing his perilous delusions.

91. Essentially, law enforcement's failure to enforce the CPO against Colombo, confront him about his threats, or take any concrete steps to intervene sent an undeniable message of tolerance and acceptance of his criminal behavior. This tacit acceptance fueled Colombo's threatening behavior, escalating it and ultimately leading to the violent incident of July 9, 2021.

92. This pattern of negligence by law enforcement did not merely fail to deter Colombo's harmful behavior—it actively contributed to his escalation, as he believed he could act with impunity. The inaction left Plaintiff unprotected and directly resulted in the tragic incident that forms the basis of this lawsuit.

## V. FIRST CLAIM FOR RELIEF
## 42 U.S.C. §1983 – STATE CREATED DANGER

93. Plaintiff re-alleges and incorporates by reference all allegations contained in the preceding paragraphs.

94. This claim is brought against all Defendants including DOES.

95. This cause of action is brought under the Fourteenth Amendment to the United States Constitution, specifically the Due Process Clause.

96. The facts of the case, as provided by Plaintiff, demonstrate a pattern of behavior by Defendants that created or increased a danger to Plaintiff and their failure to protect her resulted in a direct injury.

97. Defendants were aware of Mario Colombo's threats against Plaintiff, as evidenced by the emergency protective order (EPO) and the CPO issued to protect Plaintiff from Colombo.

98. Despite this awareness and multiple reports of CPO violations by Plaintiff, Defendants repeatedly failed to take appropriate and necessary action to protect Plaintiff, instead providing inconsistent advice, such as suggesting she change her phone number and mail

her form letters, while neglecting to fully investigate or act on clear evidence of violation.

99. Particularly egregious was Officer Terry Cooper's promise to Plaintiff during an unrecorded portion of their encounter that she would have Colombo arrested, creating a false sense of security for Plaintiff.

100. Furthermore, officers repeatedly provided Plaintiff with "Victim's Right" and Marsy's Law forms which explicitly promised to treat Plaintiff with fairness and respect, to protect her from intimidation, harassment, and abuse throughout the criminal justice process, to provide protection from Colombo and any acting on his behalf, to consider her and her family's safety when releasing Colombo from custody, and to inform her about Colombo's release. These promises not only further enhanced Plaintiff's false sense of security but also failed to materialize in substantial protective action.

101. If Defendants had clearly and accurately communicated to Plaintiff that her safety was in imminent jeopardy, she would have pursued a variety of measures to avoid the life-threatening incident that subsequently occurred. These actions could have included forgoing the use of her personal vehicle, which Colombo could easily identify; altering her regular commute to work to evade Colombo's known tracking; undertaking a significant change in her appearance or identity to avoid recognition by Colombo; relocating from her current city or even the state to put considerable geographical distance between herself and Colombo; or procuring and wearing a bullet-proof vest for her personal protection.

102. Defendants also took away Colombo's firearms, infuriating him given his views on the Second Amendment. Defendants knew that Colombo blamed Plaintiff for getting his firearms taken away. Defendants also knew Colombo was so upset about his right to bear arms being revoked, that he had stolen a gun to kill her for her part in causing it.

103. The catastrophic harm inflicted upon Plaintiff was the direct and foreseeable result of a systemic and persistent pattern of constitutional deprivations, instituted and maintained by the individual officers. These officers showed a chronic and willful failure to uphold their professional duties, ignoring multiple reported death threats and violations of the Court-issued Protective Order (CPO).

104. These accumulated failures created a perilous environment where Colombo was empowered, feeling emboldened to continue his violent threats and ultimately act upon them. By their negligence and lack of action, these officers allowed Colombo to roam freely, acquire a firearm, and escalate his harassment and threats against Plaintiff, all the while developing a dangerous delusion of police complacency and tacit approval of his malevolent intentions towards Plaintiff.

105. Moreover, this gross dereliction of duty created a false and deadly sense of security for Plaintiff. She was given reassurances that the police were actively monitoring Colombo, protecting her from him, and managing the threat he posed - all promises made by these officers and their department. This induced Plaintiff to believe that she was safe, that the system was working in her favor, and that Colombo's threats were under control, given the lack of tangible law enforcement action against him.

106. However, in the cold light of reality, the police were not fulfilling their sworn duty to protect Plaintiff. Instead, their inaction and apparent indifference to Colombo's repeated violations of the CPO effectively endorsed his criminal behavior, undermining the security of Plaintiff and escalating the risk of the ultimate violent confrontation.

107. This lawsuit contends that the officers' combined failure to enforce the domestic violence laws, confront Colombo, and fulfill their professional obligations resulted in the most devastating consequences for Plaintiff. Their willful neglect shocks the conscience and transformed what should have been a shield of protection into a deadly trap for Plaintiff, and this lawsuit seeks justice for this egregious violation of her rights.

108. This pattern of inaction and misdirection culminated in the foreseeable crescendo, which was the ambush on July 9, 2021, where Colombo shot Plaintiff, causing significant physical harm, including quadriplegia.

///

///

///

///

## VI.  SECOND CLAIM FOR RELIEF

### 42 U.S.C. §1983 – FAILURE TO TRAIN

109. The Plaintiff re-alleges and incorporates by reference all allegations contained in the preceding paragraphs.

110. This claim is brought against Defendant City of Fresno Police Department, City of Fresno including DOES 16 through 50.

111. Defendant Fresno Police Department, and Defendant Officers named above, at all relevant times, maintained an unwritten, de facto policy, practice, or custom which attempted to alleviate the police of all their obligations under the law by creating, unwritten, inconsistent, and unrealistic red tape that a victim had to navigate before anything was done.

112. This de facto policy required victims of domestic violence and/or CPO violations, including Plaintiff, repeatedly report violations, gather and keep evidence, transmit evidence to Defendants, to physically go to the police station, sign an official complaint, repeatedly call the domestic violence unit, wait until a report is finished before calling the police about the violations again, wait for a district attorney to bring a charge before the police would take any action, change their phone number, and other vague administrative steps.

113. The aforementioned de facto policy, practice, or custom was pervasive and deeply ingrained within Defendant's police department. It existed either through an official decision made by an individual with final policymaking authority or as an unwritten practice that was so persistent and widespread that it carried the force of law. Even though this policy was not formally acknowledged by the Defendants in written form, it had significant implications for guiding the actions of officers in similar future situations. It was a standing decision intended to serve as a precedent, thereby creating an official policy.

114. This policy was not an isolated incident but was evidenced in the repeated actions and decisions of Defendant's officers when responding to Plaintiff's reports of domestic

violence and CPO violations.

115. The systematic disregard for domestic violence and CPO violations, failure to act with urgency or take necessary protective measures, failure to arrest the perpetrator despite clear violations of the CPO and placing the burden on the victim to initiate substantive police action reveal a pervasive failure to train, supervise, and correct the offending behavior within the Fresno Police Department. Even in the absence of a formal written policy, this persistent failure is evidence of a "policy or custom".

116. This de facto policy demonstrated a deliberate indifference to Plaintiff's constitutional rights, including but not limited to her rights under the Fourteenth Amendment to the U.S. Constitution, by placing the burden on victims of domestic violence to seek enforcement of CPO's and allowing for repeated violations of such orders to occur without timely or adequate police intervention.

117. Furthermore, there is a direct causal link between this policy and Plaintiff's harm. This policy was the moving force behind the constitutional violation as it was responsible for Plaintiff's continued exposure to Colombo, his unthwarted violations of the CPO, emboldening him, and culminating in her being shot by Colombo.

118. Through its deliberate conduct, the City of Fresno was the moving force behind the injury sustained by Plaintiff because of their direct causal link between the Government action and the deprivation of her constitutional rights.

119. Had Defendant officers not adhered to this policy and instead taken swift action in response to Plaintiff's reports, taken steps to enforce the CPO, and arrested Colombo for his violations, Plaintiff's harm would have been mitigated or prevented altogether.

120. Defendant's deliberate indifference and the subsequent lack of appropriate response created a foreseeable risk of harm to Plaintiff, which ultimately materialized. Fresno Police Department's behavior was not simply a passive response to a volatile situation; rather, it was an active reinforcement of a dangerous circumstance.

121. Therefore, the City of Fresno, through its police department, is liable for Plaintiff's harm resulting from this de facto policy.

122. This policy, practice, or custom was not formally adopted or published by the Fresno Police Department.

123. Defendant City of Fresno Police Department performed an internal review of this matter and apparently confirmed that the officers adhered to its own de facto policies, further evidencing that the complete and utter failure to follow California law, their own written policies, and basic policing standards.

124. Fresno Police Department's consistent neglect and failure to enforce the laws pertaining to Mario Colombo's continuous threats and violations against Plaintiff established an environment of leniency and impunity. This de facto policy of inaction, contravening their legal and moral obligations, unmistakably engendered a sense of immunity in Colombo, thereby reinforcing his delusional obsession and escalating his violent tendencies towards Plaintiff.

125. When faced with the escalating severity of Colombo's violations of the Court-issued CPO, the Police Department's noticeable non-compliance with their duty to intervene—such as through arrest, prosecution, or even substantial confrontation—consolidated Colombo's perceived impunity. This lack of accountability undeniably bolstered Colombo's resolve to persist with his malevolent activities unencumbered by fear of retribution.

126. This glaring failure by the Police Department in carrying out its fundamental duties distorted Colombo's perception of societal norms, legal boundaries, and his very understanding of consequences. Colombo came to view the police's inaction as a passive endorsement of his dangerous obsession with Plaintiff, further amplifying his dangerous delusions and violent predispositions.

127. In essence, the Police Department's steadfast refusal to enforce the CPO against Colombo, or to meaningfully confront or intervene, sent an unequivocal message of tolerance for his criminal behavior. This perceived approval by the very institution charged with her protection accelerated Colombo's threatening behavior, enabling it to escalate unimpeded, ultimately culminating in the violent incident of July 9, 2021.

128. The Police Department's failure wasn't merely a passive omission; it was a

contributory factor to the escalation of Colombo's behavior, as he was led to believe he could act without repercussions, and indeed in Colombo's delusion mind mind that the Police Department agreed with Colombo's acts. This abdication of duty left Plaintiff in a vulnerable and unprotected state, resulting in the tragic incident that is the crux of this lawsuit.

129.   This pattern of inaction and misdirection culminated in the foreseeable crescendo, which was the ambush on July 9, 2021, where Colombo shot the Plaintiff, causing significant physical harm, including quadriplegia.

## VII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests entry of judgment in her favor and against Defendants as follows:

A.  For compensatory damages, including medical expenses, earnings, and other economic damages, and pain, suffering, disfigurement, loss enjoyment of life, and other noneconomic damages under federal and state law, in the amount to be proven at trial;

B. For loss of financial support;

C. For interest;

D. For reasonable costs of this suit and attorneys' fees, including pursuant to 42 U.S.C. § 1988; and;

E. For such further other relief as the Court may deem just, proper, and appropriate.

Respectfully Submitted,

Dated: May 26, 2023                          **THE VARTAZARIAN LAW FIRM**

By: _____
Steve Vartazarian, Esq.
Matthew J. Whibley, Esq.
Sarkis Yenikomshuyan, Esq.
**Attorney for Plaintiffs,**
JENNIFER REGAN