**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JENNIFER REGAN,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF FRESNO, FRESNO POLICE DEPARTMENT, OFFICER ART DELEON, OFFICER LINDSAY DOZIER, OFFICER TERRY COOPER, OFFICER MATTHEW BRANDT, OFFICER DANIEL CORONA, OFFICER TY MCFADDEN and DOES 1 through 50,<br><br>    Defendant. | Case No.: 1:23-cv-00828 JLT SKO<br><br>ORDER GRANTING MOTION TO DIMISS WITH LEAVE TO AMEND<br><br>(Doc. 29)<br><br>**45 Day Deadline** |

### I.  BACKGROUND

Jennifer Regan alleges that Defendants, the City of Fresno (City), its Police Department (FPD), and several of its sworn peace officers, failed to protect her from her abusive ex-boyfriend, Mario Colombo, despite her numerous communications with Defendants in which she relayed, among other things, that he was threatening to shoot her. (Doc. 1.)[1]

In the early months of 2021, Colombo was arrested for threatening Plaintiff's life and was issued a criminal protective order (CPO) to cease all contact with Plaintiff and to stay away from Plaintiff's person, home, work, and family. (*Id*., ¶¶ 31–35.) The situation continued to escalate,

---

[1] The facts described in Plaintiff's complaint are presumed true for purposes of evaluating the pending motion to dismiss.

1

with Colombo showing up near Plaintiff's home and eventually leaving live ammunition on her doorstep. (*Id*., ¶¶ 41–46.) Despite Plaintiff's repeated calls to Defendants about her concerns, Plaintiff claims that Defendants responded largely with inaction and by giving conflicting and confusing advice. (*See id*., ¶¶ 40, 46, 48–50.)

In late June and early July 2021, Colombo left Plaintiff threatening voicemail messages, which Plaintiff reported to police. (Doc. 1, ¶¶ 53, 58.) On July 7, 2021, Plaintiff told Defendant Officer Terry Cooper that she received a call from Colombo's ex-girlfriend, who indicated that Colombo had been burning bridges with all his friends and that he had stolen a gun with the specific intent to use it to kill Plaintiff. (*Id*., ¶ 62.) Plaintiff provided Officer Cooper a corroborating text message. (*Id*., ¶ 63.) Officer Cooper indicated to Plaintiff that she was "going to send detectives to arrest Colombo right away," which Plaintiff alleges gave her "a confusing and inconsistent sense of security." (*Id*., ¶ 64.) However, Plaintiff alleges that Officer Cooper did not in fact do anything to arrest or thwart Colombo. (*Id*., ¶ 65.)

On July 9, 2021, with the assistance of another person, Colombo ambushed Plaintiff at a red light, shooting her twice in the upper body. Plaintiff subsequently crashed into another vehicle at Herndon Ave. and N. First Street due to her injuries. (Doc. 1, ¶ 17.) Plaintiff was shot through the neck, which severed her spinal cord. (*Id*., ¶ 18.) She survived the shooting. (*Id*., ¶ 19.) As of the date the Complaint in this case was filed, Plaintiff was living with quadriplegia and is "entirely dependent on others for all activities of daily living including feeding, bathing, dressing, and using the bathroom." (*Id*.)

Plaintiff filed this federal civil rights lawsuit against the City, FPD, and FPD Officers Art Deleon, Lindsay Dozier, Terry Cooper, Matthew Brandt, Daniel Corona, and Ty Mcfadden. (Doc. 1.) She alleges all Defendants violated her Fourteenth Amendment substantive due process rights under the state-created danger doctrine. (*Id*., ¶¶ 93-108.) She also advances a failure to train claim against the City and FPD, pointing to their "systematic disregard for domestic violence and CPO violations, failure to act with urgency or take necessary protective measures, failure to arrest the perpetrator despite clear violations of the CPO and placing the burden on the victim to initiate substantive police action reveal a pervasive failure to train, supervise, and correct the offending

behavior within the Fresno Police Department." (*Id*., ¶¶ 109–129.)

Defendants move to dismiss both claims. (Doc. 29.)[2] Plaintiff does not oppose dismissal of the failure to train claim, so that motion is **GRANTED**. Plaintiff does oppose dismissal of her state created danger claim, (Doc. 31), and Defendants filed a reply. (Doc. 32.) For the reasons set forth below, the Court will grant the motion to dismiss the state created danger claim with leave to amend because the facts as alleged do not support this cause of action under these circumstances.

## II.    LEGAL STANDARDS

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In ruling on a motion to dismiss filed pursuant to Rule 12(b), the Court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 899 (9th Cir. 2007) (citation and quotation marks omitted).

Dismissal of a claim under Rule 12(b)(6) is appropriate when "the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Supreme Court explained,

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (internal citations omitted).

When considering a motion to dismiss, the Court must accept the factual allegations made in the complaint as true. *Hosp. Bldg. Co. v. Rex Hosp. Tr.*, 425 U.S. 738, 740 (1976). A court

---

[2] The Defense of qualified immunity has not yet been raised. (*See generally* Docs. 29, 32.)

3

must construe the pleading in the light most favorable to the plaintiffs and resolve all doubts in favor of the plaintiffs. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). However, legal conclusions need not be taken as true when "cast in the form of factual allegations." *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003).

To the extent pleadings can be cured by the plaintiff alleging additional facts, leave to amend should be granted. *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

### III.     DISCUSSION

The Due Process Clause of the Fourteenth Amendment is "a limitation on state action and is not a 'guarantee of certain minimal levels of safety and security.'" *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019) (quoting *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 195 (1989)).

> Simply failing to prevent acts of a private party is insufficient to establish liability. The general rule is that a state is not liable for its omissions and the Due Process Clause does not impose a duty on the state to protect individuals from third parties.
>
> There are two exceptions to this general rule. First, a special relationship between the plaintiff and the state may give rise to a constitutional duty to protect. Second, the state may be constitutionally required to protect a plaintiff that it affirmatively places . . . in danger by acting with deliberate indifference to a known or obvious danger.

*Id*. (internal quotations and citations omitted)

The seminal state-created danger case, *DeShaney*, 489 U.S. at 191, held that social workers and local officials were not liable under § 1983 on a failure-to-act theory for injuries inflicted on a child by his father. Though the defendants received complaints that the child was abused by his father, they failed to remove the child from his father's custody. *Id*. The Supreme Court reasoned that "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id*. at 201 (emphasis added). The Court acknowledged that the state had previously taken temporary custody of the child and then returned him to his father, but found that this "placed [the child] in no worse position than that in which he would have been had it not

4

acted at all[.]" *Id*. "Given that the state actors did not create or enhance any danger to the child, the state did not have a constitutional duty to protect him from the private violence inflicted by his father." *Murguia v. Langdon*, 61 F.4th 1096, 1110 (9th Cir. 2023) (citing *DeShaney*, 489 U.S. at 201).

The Ninth Circuit "ha[s] interpreted *DeShaney* to mean that if affirmative conduct on the part of a state actor places a plaintiff in danger, and the officer acts in deliberate indifference to that plaintiff's safety, a claim arises under § 1983." *Id*. (internal quotation omitted). The Ninth Circuit's summary of the doctrine in *Murguia* concisely explains the controlling standards:

> The state-created danger exception has two requirements. "First, the exception applies only where there is 'affirmative conduct on the part of the state in placing the plaintiff in danger.' Second, the exception applies only where the state acts with 'deliberate indifference' to a 'known or obvious danger.'" [*Patel v. Kent sch. Dist*., 648 F.3d 965, 974 (9th Cir. 2011)] (internal citation omitted) (quoting *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000) and then quoting *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).
>
> To satisfy the first requirement, a plaintiff "must show that the officers' affirmative actions created or exposed [him] to an actual, particularized danger that [he] would not otherwise have faced." *Martinez*, 93 F.3d at 1271. "In examining whether an officer affirmatively places an individual in danger, we do not look solely to the agency of the individual, nor do we rest our opinion on what options may or may not have been available to the individual. Instead, we examine whether the officers left the person in a situation that was more dangerous than the one in which they found him." *Munger*, 227 F.3d at 1086. "The critical distinction is not . . . an indeterminate line between danger creation and enhancement, but rather the stark one between state action and inaction in placing an individual at risk." [*Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997)]. Furthermore, the plaintiff's ultimate injury must have been foreseeable to the defendant. *Martinez*, 943 F.3d at 1273. "This does not mean that the exact injury must be foreseeable. Rather, 'the state actor is liable for creating the foreseeable danger of injury given the particular circumstances.'" *Id*. at 1273–74 (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064 n.5 (9th Cir. 2006)).
>
> As to the second requirement, "Deliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Patel*, 648 F.3d at 974 (*Bryan Cnty v. Brown*, 520 U.S. 397, 410 (1997)). This standard is higher than gross negligence and requires a culpable mental state. *Id.* at 974. When assessing non-detainee failure-to-protect claims, we apply a purely subjective deliberate indifference test. *Herrera v. L.A. Unified Sch. Dist*., 18 F.4th 1156, 1161 (9th Cir. 2021). "For a defendant to act with deliberate indifference, he must 'recognize[ ]

5

> the unreasonable risk and actually intend[ ] to expose the plaintiff to such risks without regard to the consequences to the plaintiff.'" *Id*. at 1158 (quoting *Grubbs*, 92 F.3d at 899). In other words, the state actor must "know[ ] that something is going to happen but ignore[ ] the risk and expose[ ] [the plaintiff] to it." *Grubbs*, 92 F.3d at 900 (emphasis in original). "The deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state." *Patel*, 648 F.3d at 974.

61 F.4th at 1111.

Here, the primary Defense argument is that Plaintiff has failed to allege a sufficient affirmative act. The Ninth Circuit has applied the state-created danger doctrine in several cases that are instructive here. In *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1057 (9th Cir. 2006), Kimberly Kennedy called the police to report that a young neighbor had molested her daughter. Kennedy warned police that the neighbor had violent tendencies. *Id*. The investigating officer assured Kennedy that she would be given notice prior to any police contact with the alleged abuser or his family. *Id*. at 1058. Later that month, rather than giving Kennedy the promised *prior* notice, the officer interviewed the alleged abuser's mother and informed her of the Kennedy's allegations. *Id*. Then, *after* that interview was conducted, the officer told Kennedy that the other mother now had knowledge of the molestation allegations. *Id*. Kennedy expressed fear for her safety. *Id*. The officer assured Kennedy that police would patrol the area around her house and the accused abuser's house to "keep an eye" on the situation. *Id*. Though the family immediately made plans to leave town the next day, the alleged abuser broke into the Kennedy's home overnight and shot both the Kennedy parents while they slept. *Id*.

The Ninth Circuit concluded that the officer "affirmatively created a danger" to the Kennedy family by informing the abuser's family before the Kennedy family had the opportunity to protect themselves. 439 F.3d at 1063. This created an opportunity for the abuser to assault the Kennedys "that otherwise would not have existed." *Id*. In addition, the Ninth Circuit noted that the officer had assured the Kennedys that, given the threat posed, they would patrol the neighborhood that night. *Id*. Though the Ninth Circuit "[did] not rest [the] judgment that [the] officer] affirmatively created a danger on that assurance alone, [ ] in light of it, it is quite reasonable that the Kennedys decided late that night . . . to remain at home" instead of leaving

1    immediately. *Id*. Therefore, the officer's "misrepresentation as to the risk the Kennedy's faced
2    was an additional and aggravating factor, making them more vulnerable to the danger he had
3    already created." *Id*.

4        *Martinez*, 943 F.3d 1260, provides additional definition to these rules in the domestic
5    violence context. Martinez, a victim of repeated sexual and physical abuse at the hands of her
6    one-time boyfriend, sued several officers and municipal entities under the state-created danger
7    doctrine. *Id*. at 1266–70. She advanced several allegations that were found insufficient to trigger
8    the state created danger doctrine. For example, she alleged that one officer "placed her in greater
9    danger by failing to inform her of her rights or options, failing to provide her with [a police]
10   handout for domestic violence victims, and failing to make an arrest." *Id*. at 1272. Though "these
11   failures may have been a dereliction of [the officer's] duties, they were not an affirmative act that
12   created an actual, particularized danger." *Id*. (internal quotation and citation omitted). Another
13   officer "failed to separate [plaintiff] from [her abuser] when conducting [an] interview, . . . did
14   not provide [plaintiff] with information that may have allowed her to escape further abuse, and
15   did not issue an emergency protective order." *Id*. These allegations were also insufficient because
16   "Martinez was left in the same position she would have been in had [the officer] not acted at all."
17   *Id*. However, one officer told Martinez's alleged abuser about her allegations and stated that she
18   was not "the right girl" for Martinez. *Id*. The Ninth Circuit concluded that a reasonable jury could
19   have found that the officer's disclosures provoked the abuser, and that the officer's disparaging
20   comments about the plaintiff emboldened the abuser to believe he could further harm plaintiff
21   with impunity. *Id*.;[3] *see also Okin v. Village of Cornwall-On-Hudson Police Dept*., 577 F.3d 415,
22   430–31 (2d Cir. 2009) (holding that officers who "openly expressed camaraderie with [an abuser]
23   and contempt for [the victim]" increased the danger to the victim)[4].

---

[3] The Ninth Circuit recently held that another officer involved in the *Martinez* domestic abuse investigation and who engaged in similar conduct was nonetheless shielded by the doctrine of qualified immunity because the case law in existence at the time of the relevant conduct did not make it clear that such conduct would violate the constitution. *Martinez v. High*, 91 F.4th 1022, 1030–31 (9th Cir. 2024).

[4] Plaintiff relies on *Okin* for the proposition that a failure to protect claim may arise when law enforcement officers demonstrate a "dismissive" attitude toward domestic abuse allegations. (*See* Doc. 31 at 5.) However, the Ninth Circuit acknowledged in *Martinez* that *Okin* had not been "embraced by a consensus of courts," and may be "in tension" with Supreme Court precedent, including *DeShaney*. *Martinez*, 943 F.3d at 1276. Regardless, though the

One case not mentioned by either party is *Henderson v. County of Santa Cruz*, 2015 WL 225429, *1 (N.D. Cal. Jan. 16, 2015). There, James, a mentally ill inmate confined to a county jail threatened his parents while in confinement. *Id*. The parents allegedly received assurances from the county that they would be warned before the inmate was released. *Id*. They were not warned, however, and James murdered his parents within several months of his release. *Id*. Viewing the facts in the light most favorable to the deceased parents, the district court concluded that the complaint sufficiently alleged that the county's conduct exposed the parents "to a danger they would not have otherwise faced."

> Specifically, because the Hendersons were not warned that James was released, or that he was released into homelessness, they "did not call upon other law enforcement authorities or resources to ensure their safety upon James' release." Although the County argues that the Hendersons knew of James's violent threats, and knew that he would be released eventually, the Hendersons did not know James would be released into unsupervised homelessness and may have taken additional steps to protect themselves. Thus, had the County done nothing–made no representations to the Hendersons—they would have faced the danger of James being released and surprising them without any warning. Based on the actions of the County—assuring the Hendersons that they would be notified of James's release—the Hendersons believed they faced a much [] different risk, and did not prepare themselves for the risk they actually faced.

*Id.* at *5. Though "a mere failure to warn of a danger is not a sufficient state act, as it is not affirmative conduct," the Hendersons "alleged affirmative conduct on the part of the County when the County made a promise to warn the Hendersons and then released James into homelessness." *Id*. Those allegations "align[ed]" the case with *Kennedy*, "where a failure to warn arguably placed plaintiffs in a more dangerous situation than the family previously faced." *Id*. (citing *Kennedy*, 439 F.3d at 1063).

One district court has reasoned that *Kennedy* and *Henderson* "teach that actionable danger

---

officers in *Martinez* were granted qualified immunity due to the "muddled" nature of the law as of 2019, going forward the Ninth Circuit held "that the state-created danger doctrine applies when an officer reveals a domestic violence complaint made in confidence to an abuser while simultaneously making disparaging comments about the victim in a manner that reasonably emboldens the abuser to continue abusing the victim with impunity." *Id*. In addition, the Ninth Circuit held "that the state-created danger doctrine applies when an officer praises an abuser in the abuser's presence after the abuser has been protected from arrest, in a manner that communicates to the abuser that the abuser may continue abusing the victim with impunity." *Id*. Notably, the Complaint in this case does not allege similar conduct.

1  created by the state's failure to warn requires affirmative assurances by the state that are later
2  reneged." *Coats v. City of Los Alamitos*, No. 8:18-CV-01161 JLS DFM, 2019 WL 6903833, at *6
3  (C.D. Cal. Aug. 2, 2019) (distinguishing *Henderson* because the state actor did not promise to
4  apprise the victims of a third-party threat). However, other district courts have emphasized that
5  such assurances cannot make out a claim on their own. *Id*. This was the case in *Kennedy*, where,
6  as discussed above, the promise of police patrols amounted to a "misrepresentation as to the risk
7  the Kennedy's faced," which was an "additional and aggravating factor, making them more
8  vulnerable to the danger [the officer] had already created." 439 F.3d at 1063.

9       *Cushman v. City of Troutdale*, No. CIV. 07-0012-HU, 2009 WL 890505 (D. Or. Mar. 30,
10 2009), provides some additional perspective. There, the plaintiff, Cushman, was dating Ramirez,
11 who was on probation after a prior domestic abuse conviction. *Id*. at *1. Ramirez struck Cushman
12 and she went to the police and indicated she wanted to press charges. *Id*. According to Cushman,
13 the investigating officer, Leake, promised to contact Ramirez's probation officer. *Id*. at *4. It was
14 unclear whether the officer did so before he left on an extended vacation without telling Plaintiff.
15 *Id*. at *1 While the officer was away, Ramirez attacked Cushman with a knife, seriously injuring
16 her. *Id*. Cushman argued that the officer's promise to inform Ramirez's probation officer was
17 akin to the promise to pre-warn the Kennedys of any conversation with the abuser's family,
18 "thereby creating the same false sense of security." 2009 WL 890505, at *4. The *Cushman* court
19 did not agree because, unlike in *Kennedy* where the officer affirmatively created a danger by
20 notifying the alleged abuser's family of the allegations against him, the state did not create the
21 danger faced by Cushman.

> Consistent with *Kennedy*, other Ninth Circuit courts have required proof that the state actor created the danger. *See Munger v. City of Glasgow*, 227 F.3d 1082 (9th Cir. 2000) (holding police officers could be held liable for the death from hypothermia of a visibly drunk patron they had ejected from a bar on an extremely cold night); *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) (holding as viable a state-created danger claim against police officers who, after finding a man in grave need of medical care, cancelled a request for paramedics and locked him inside his house); *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992) (holding state employees could be liable for the rape of a registered nurse assigned to work alone with a known, violent sex-offender); *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989) (holding state could be liable for the rape of a

> woman that an officer had left stranded in a known high-crime area late at night).
>
> In every case involving state-created danger, the state actor played a significant role in creating the dangerous situation: whether by revealing the plaintiff's allegations to the neighbor in *Kennedy*, ejecting the drunk patron from a bar in Munger, dragging the injured man inside his house in *Penilla*, assigning the nurse to work alone with a known sex-offender in Grubbs, or stranding a woman in a dangerous area in Wood. Leake's supposed affirmative acts fall far short of this standard. Construing the facts in the light most favorable to plaintiff, Leake is guilty of the following: assuring plaintiff that he would call Montgomery, telling plaintiff she did not need to call Montgomery, failing to contact Montgomery, not running a background check on Ramirez, telling plaintiff to investigate areas she thought Ramirez might visit and report his whereabouts, and going on vacation without telling plaintiff or changing his answering machine message.
>
> There is no evidence that plaintiff's injuries were caused by forces that Leake set in motion. Unlike the officer in Kennedy, who created a dangerous situation by revealing the plaintiff's accusations to her neighbor, Leake's conduct did not create a danger that plaintiff did not already face. Rather, the record clearly indicates that Ramirez—high on methamphetamine and with a history of domestic violence—independently decided to attack plaintiff on October 8, 2005. Although Leake may have been able to prevent plaintiff's injuries, by either contacting Montgomery or otherwise helping to take Ramirez into custody, Leake's alleged negligence did not create a danger that did not previously exist. Because plaintiff has not shown an affirmative conduct that created a danger, plaintiff cannot establish a due process claim.

*Id*. at *5. *Coates* recognized there is "tension" between *Cushman* and *Henderson*, but declined to resolve that tension, finding that Coats had not alleged a relevant promise or assurance. *See Coats*, 2019 WL 6903833, at *7 n.7.

Here, Plaintiff alleges that two days before the shooting, Officer Cooper promised to arrest Columbo "right away," but ultimately failed to take steps to do so. (Doc. 1, ¶¶ 64–65.) This conduct resembles the conduct in *Henderson* in some respects because Cooper's alleged promise could have caused Plaintiff to believe the risk Columbo posed to her had been abated. However, *Henderson* is at least arguably distinguishable. There, the county defendants took the affirmative step of releasing James into the community. That, coupled with their failure to warn the parents arguably amounted to an affirmative act akin to the act(s) at issue in *Kennedy*. *Id*. Here, by contrast, Cooper's failure to arrest Columbo as promised did nothing to create the danger posed to

10

1  Plaintiff by Columbo. This brings the present case much closer to the facts of *Cushman*, where
2  the officer's failure to contact the abuser's probation officer was not affirmative conduct that
3  created a danger.
4      Plaintiff's other allegations do not meet the threshold either. She argues generally that she
5  has alleged "a series of omissions and lack of intervention that created a dangerous situation for
6  the Plaintiff." (Doc. 31 at 4.)[5] Indeed Plaintiff has alleged that Defendants provided her with false
7  promises of protection by repeatedly giving her victim's rights handouts and related paperwork
8  which "promised" her protection from abuse. (Doc. 1, ¶ 100.) She also alleges that Defendants
9  promised to "consider her and her family's safety when releasing Columbo from custody, and to
10 inform her about Columbo's release." (*Id*., ¶ 100.) These allegations do not amount to affirmative
11 conduct that created any danger.
12     The Court notes that the Complaint contains confusing allegations regarding the possible
13 confiscation of Columbo's registered firearms by police. Plaintiff alleges that on June 23, 2021,
14 "Officer[s] Brandt and McFadden confirmed through records check that Colombo had registered
15 firearms, and that there was a valid CPO which Colombo was in violation of." (Doc. 1, ¶ 55.)
16 Apparently, Columbo also left an angry voicemail for Plaintiff on June 23, 2021 indicating,
17 among other things, that "the cops took my guns." (*Id*., ¶ 53.) According to Plaintiff, "Colombo was
18 a well-known, strong proponent of his Second Amendment rights. His public Facebook account made
19 it clear that he viewed any intrusion on his Second Amendment as a violent and personal attack
20 against him for which he would take revenge for. Colombo believed Plaintiff was to blame if his guns
21 were taken away." (*Id*., ¶ 54.) Elsewhere, however, the Complaint appears to acknowledge that
22 Columbo's weapons <u>were not actually confiscated</u>. (*Id*., ¶ 55 ("It was unclear whether law
23 enforcement had in fact taken Colombo's guns away, but it appears not.").) To the extent Plaintiff is
24 suggesting that the confiscation of Columbo's weapons, or possibly just the threat of that confiscation,
25 satisfies the affirmative act requirement as that requirement is set forth in *Martinez*, the Court believes
26
27 [5] Perhaps recognizing that these allegations do not match the relevant standard, she also attempts to re-shape the holding of *Kennedy* as follows: "a state actor can be held liable if they failed to protect a plaintiff, after promising to
28 do so, where there were already known threats from a third party." (Doc. 31 at 4.) As discussed in detail above, this is not the standard that binds the Court.

11

the present allegations are insufficient, as the role of the police in any confiscation effort remains unclear, even viewing the facts in the light most favorable to Plaintiff. However, because the deficiencies outlined herein may be curable by the allegation of additional facts, the Court will permit the filing of an amended complaint. Plaintiff is cautioned, however, to read this ruling carefully. Particularly considering the elimination of the *Monell* claim, Plaintiff must take care to examine the conduct of each responding officer and only name in any amended complaint those officers as defendants whose own conduct plausibly amounts to a constitutional violation.

## IV.   CONCLUSION AND ORDER

For the reasons set forth above:

(1)   The motion to dismiss (Doc. 29) is **GRANTED WITH LEAVE TO AMEND**.

(2)   Plaintiff shall have **45 days** to file any amended complaint or a notice that she will not be amending the complaint. Failure to timely file an amendment or notice of non-amendment may result in the Court *sua sponte* dismissing the action without further notice.

IT IS SO ORDERED.

Dated:   **April 18, 2024**

UNITED STATES DISTRICT JUDGE